NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (4th) 251384-U

NO. 4-25-1384

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 30, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| ADAM DANE, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| DORILE BURNELL SR., | ) | No. 24CH38 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Lisa Renae Fabiano, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Zenoff and Lannerd concurred in the judgment.

**ORDER**

¶ 1     *Held*:    By finding that defendant had failed to prove adverse possession by virtue of a split-rail fence, the circuit court did not make a finding that was against the manifest weight of the evidence.

¶ 2     Plaintiff, Adam Dane, sued defendant, Dorile Burnell Sr., in the Winnebago County circuit court, alleging that defendant's fence trespassed on plaintiff's land. Defendant raised adverse possession as a defense. At the conclusion of a bench trial, the court found that, as to the half of defendant's fence that was a chain-link fence, defendant had proved adverse possession. The court found, however, that, as to the remaining half of his fence that was a split-rail fence, defendant had failed to prove adverse possession. Defendant appeals the part of the judgment that is unfavorable to him, the part about the split-rail fence.

¶ 3     Applying our deferential standard of review, we conclude that this appeal lacks merit. By finding that defendant had failed to prove adverse possession by virtue of the split-rail

fence, the circuit court did not make a finding that was against the manifest weight of the evidence. Therefore, we affirm the court's judgment.

¶ 4                                      I. BACKGROUND

¶ 5                                  A. The Amended Complaint

¶ 6         The amended complaint had three counts.

¶ 7         Count I was an action for trespass, claiming that defendant's fence encroached on plaintiff's land and requesting, along with damages, an order that defendant remove the fence.

¶ 8         Count II sought, in the alternative, a permanent injunction to remove the fence and thereby eliminate the trespass, which allegedly interfered with plaintiff's full use and enjoyment of his property and thereby caused him monetary damages in an amount not easily ascertainable. (Evidently, it was this difficulty in ascertaining the amount of damages that made count II an alternative to count I, which sought damages.)

¶ 9         Count III was an action for nuisance, claiming that the fence posed a safety hazard by obstructing the view of plaintiff's tenants as they backed out of plaintiff's driveway. This count likewise sought damages and an order to remove the fence.

¶ 10                                      B. The Bench Trial

¶ 11                                  1. *Plaintiff's Testimony*

¶ 12         For about eight years preceding the bench trial, which was held on July 16, 2025, plaintiff had owned the residential property at 1425 Iris Avenue, or lot 9 of plat No. 2 of the Garden Hills Subdivision, in Rockford, Illinois. In the eastern part of his lot was a concrete driveway extending north from Iris Avenue to his garage, which was catty-corner behind his house, behind its northeast corner. He had done nothing to change the driveway; it was there, in its present location, when he bought the property.

¶ 13        Also, when plaintiff bought lot 9, his neighbor to the east, defendant, had a split-rail fence along lot 9's east boundary. The split-rail fence, which had been in disrepair ever since plaintiff bought his lot, extended north from the sidewalk on Iris Avenue to about the halfway point of the two lots. It was a front-yard fence.

¶ 14        On cross-examination, plaintiff identified defendant's exhibit No. 1 as a photograph of the split-rail fence. He agreed that, in this photograph, the corner post of the split-rail fence, before the fence turned east 45 degrees and extended along the sidewalk on Iris Avenue, was "completely adjacent" to his driveway, that is, the post was planted right up against the eastern edge of his driveway. He further agreed that the split-rail fence, as shown in defendant's exhibit No. 1, "appear[ed] to be in" "[p]retty much" "the same condition" as when he bought lot 9 in 2018 or 2019.

¶ 15        However, the post abutting the driveway was only one post of the split-rail fence, which, plaintiff noted on redirect examination, was not a "perfectly straight" fence, "north-south." He agreed that, in another photograph of the split-rail fence, plaintiff's exhibit No. 6, which had been taken from a vantage point farther up the driveway, other posts of the fence were not right up against the driveway. Instead, a few inches of turf could be seen between those posts and the eastern edge of the driveway. In other words, from the sidewalk on Iris Avenue to farther up the driveway, the split-rail fence swerved a little away from the driveway and toward defendant's house.

¶ 16        Plaintiff decided to build a fence of his own on the back part, the north part, of his lot to keep in his brother's dogs. To obtain a permit to build the fence, he had to have a survey done of his lot to confirm its boundaries. So, he hired a surveyor, Stanton B. Stewart.

¶ 17        The survey that Stewart performed did not show any encroachment of the

split-rail fence onto plaintiff's lot. The survey revealed, however, that, on the north half of lot 9, from about the edge of the garage to the lot's north boundary, a chain-link fence that was more or less a continuation of the split-rail fence—and which, like the split-rail fence, was there when plaintiff bought the property—encroached on lot 9.

¶ 18          About two years before the trial, defendant made a change in his fencing. He removed the split-rail fence and replaced it with a wooden privacy fence, which was about 4½ to 5 feet tall. Unlike the split-rail fence, plaintiff claimed, the new privacy fence encroached on his property: along its entire length, the new privacy fence was flush against his driveway. According to a second survey that plaintiff had Stewart perform after defendant erected the new privacy fence, not only did the chain-link fence encroach on the north half of lot 9, but now the new privacy fence also encroached on the south half as well. So, plaintiff's complaint was that defendant's fence—the north half of which was an old chain-link fence and the south half of which was a new wooden privacy fence—stood on the east part of plaintiff's lot.

¶ 19                              2. *Stewart's Testimony*

¶ 20          Stewart identified plaintiff's exhibit No. 9 as the plat of a survey he performed of lot 9 in July 2022 at plaintiff's request. When performing this survey, he planted iron monument pins in all four corners of the lot. The plat he drew up for this survey showed a chain-link fence encroaching on the north half of lot 9 by as much as a foot by the garage and six-tenths of a foot at the northeast corner of the lot.

¶ 21          Because Stewart was hired to survey lot 9, his task, as he understood it, was to record only structures that were on that lot. He disregarded structures that were entirely on the adjoining lot 10, defendant's lot to the east. A split-rail fence did not appear in plaintiff's exhibit No. 9. Stewart inferred, therefore, that when performing the survey in July 2022, he saw no split-

rail fence on lot 9—or else he would have depicted it in the plat. When shown a photograph of the split-rail fence, he testified he did not recognize that fence.

¶ 22    Stewart could not say where the driveway was in relation to the east boundary of lot 9—whether at the boundary or a little within it—but the driveway was entirely within lot 9, for if it had encroached on lot 10, he would have drawn the driveway in the plat and would have documented the encroachment. Neither the driveway nor the split-rail fence was of concern, he explained, so there was no reason to show either structure in the plat.

¶ 23    In August 2024, Stewart revisited lot 9 at plaintiff's request and performed a second survey, the plat of which was plaintiff's exhibit No. 8. He found that the chain-link fence was in the same position as before. What had changed was that there now was a new wooden privacy fence that encroached about a foot into lot 9 next to the garage and about six-tenths of a foot into lot 9 near the sidewalk on Iris Avenue. Also, Stewart noticed that an iron monument pin, five-eighths of an inch in diameter and three feet long, which he had driven far enough into the ground to be below a lawnmower's blades, had been removed from the southeastern corner of lot 9, near the southernmost post of the new privacy fence. The pin had not been recovered.

¶ 24    3. *The Testimony of Daniel Dane*

¶ 25    Daniel Dane was plaintiff's brother, and he had lived at 1425 Iris Avenue, or lot 9, for seven years. Every day, he pulled in and out of the driveway when going to and returning from work. The new wooden privacy fence that defendant had erected was "right on the driveway," and it was "inconvenient" and "awkward to look over the top" when one was backing out of the driveway. The new fence "directly abut[ted]" the driveway, whereas the split-rail fence had not done so.

¶ 26    On cross-examination, defendant's attorney showed Daniel a photograph,

apparently defendant's exhibit No. 1, showing the southernmost post of the western section of the split-rail fence planted right up against the east side of the driveway, near the sidewalk. Commenting on this photograph, Daniel testified:

> "[T]hat is not correct. *** [T]he fence [is] laid over here. The fence was actually moved into that position at the time. This has been taken over and pulled over, [and] that is not the way it used to stand ***; that is an altered fence line, and he removed the pin."

¶ 27    Given that the survey of July 2022 indicated that the southern side of lot 9, the sidewalk side, was 60 feet long, Daniel had measured 60 feet east from the pin at the southwest corner of lot 9 and had taken photographs, plaintiff's exhibit Nos. 11 and 12, of the tape measure at the 60-foot mark. He testified:

> "These photos indicate I made a measurement from the pin, from the original pin, on the front on the west side of our property; I ran the tape measure up to where the distance is off of our survey, and what you're seeing in this picture is actually a silhouette or a shadow, but this is where the pin should have originally laid which is no longer there ***. [I]t shows that the fence that he put up is over our property line."

The 60-foot mark on the tape, as pictured in plaintiff's exhibit Nos. 11 and 12, was beyond—several inches to the east of—the new privacy fence. So, by that measurement, lot 9 extended about a foot east of the driveway.

¶ 28    As defendant was having the new privacy fence erected, Daniel protested to him that it was an encroachment, that it was on lot 9. However, as Daniel put it in his testimony, defendant "called me a white hillbilly racist trash, and that I don't own this property, and I have

nothing to do with it, and he insisted that the fence company continued to put the fence up."

¶ 29                                   4. *Defendant's Testimony*

¶ 30         After plaintiff rested, defendant testified on his own behalf. He had lived at 1421 Iris Avenue, or lot 10, for 36½ years, having moved there in January 1989. The chain-link fence was present when he acquired the property. In 1991 or 1992, the previous owners of lot 9, Victor and Lisa Wallace, put in the concrete driveway, and defendant had the split-rail fence built in 1993, after the concrete was poured. An old retired carpenter, Cecil Rhodes, who passed away years before the trial, installed the split-rail fence as a straight-line continuation of the chain-link fence that was at the back of lot 10. Rhodes put the posts of the split-rail fence directly in the ground without concrete, and after 30 years, from 1993 to 2023, the split-rail fence was rotting. Defendant tried to stabilize the split-rail fence by hammering down the posts and buttressing them with studs. Finally, he hired Rockford Fence to remove the split-rail fence and erect a privacy fence precisely where the split-rail fence had been, and Rockford Fence did so. Although defendant admitted removing the survey pin, he denied that, before replacing the split-rail fence with the new privacy fence, he moved the southernmost post of the west section of the split-rail fence closer to the driveway.

¶ 31         On cross-examination, plaintiff's attorney showed defendant a photograph, defendant's exhibit No. 4, which had been taken by someone standing on the east side of plaintiff's driveway, next to defendant's house (on the left), and facing Iris Avenue, which was approximately two or three car lengths down the driveway, to the south. In this photograph, at about the sidewalk running along Iris Avenue, the split-rail fence appeared to be against the east edge of the driveway. However, as the fence extended from the sidewalk in the direction of defendant's house (in the photographer's direction), the fence veered slightly away from the

driveway and toward defendant's house, framing, between the fence and the east edge of the driveway, a narrow wedge of green turf, with the base of the wedge at the photographer's position and its point at the sidewalk. Plaintiff's attorney asked defendant:

"Q. *** And just showing you again what's been marked as Defendant's Exhibit No. 4, do you think that that shows the rails leaning a little bit back and forth east; west, so these rails are kind of leaning towards your property and these rails, further south, are leaning maybe toward—more towards the driveway?

A. As I said earlier, that's from the ground shifting, and they're—it gets soggy and—

THE COURT: Is this the one you're showing him, right?

[PLAINTIFF'S ATTORNEY]: Yes."

¶ 32                              5. *Testimony of Sid Williams*

¶ 33        Defendant called Sid Williams, who testified he had lived at 1504 Iris Avenue, catty-corner from defendant's house and directly across the street from plaintiff' house, for 30 years. For 10 years, Williams did yard work at lot 9, cutting grass right up to the fence. According to Williams, the new privacy fence was in the same position the split-rail fence had been in: right up to or adjoining the driveway.

¶ 34                              6. *The Circuit Court's Ruling*

¶ 35        On November 25, 2025, according to the docket sheet, there was a hearing, at which the circuit court announced its decision. The transcript of this hearing does not appear to be in the record. The docket entry for that date reads as follows:

"Hearing Result: Cause comes on for Decision ***. Judgment Entered in Favor of the Plaintiff as to Front Fence. Adverse Possession to the Front Yard Privacy

Fence is Awarded to the Plaintiff. Privacy Fence to be Removed. As to the Back Yard Chain Link Fence Adverse Possession is Awarded to the Defendant. Order to be E-Filed. Case Closed."

¶ 36 On December 31, 2025, the circuit court filed a written judgment order, in which the court ruled as follows:

"1) Judgment is entered in favor of Plaintiff *** and against Defendant *** as to Count I (Trespass) and Count III (Private Nuisance) of the Amended Complaint with respect to the fence constructed on the front yard of Plaintiff['s] *** property, for the reasons stated on the record;

2) A permanent injunction is issued as to Defendant *** with respect to the fence constructed on the front yard of Plaintiff['s] property and Defendant *** is therefore ordered to remove the same; and

3) The fence constructed by Defendant *** in the 'back yard' shall not be subject to the permanent injunction set forth in Paragraph # 2 of this Order as the Court finds that Defendant *** acquired property upon which the 'back yard' fence was constructed through adverse possession, for the reasons stated on the record."

¶ 37 C. The Notice of Appeal

¶ 38 On December 23, 2025—after the circuit court orally pronounced its judgment but before it entered its written judgment order—defendant filed a notice of appeal, in which he identified the order of November 25, 2025, as the order or judgment from which he appealed.

¶ 39 II. ANALYSIS

¶ 40 To establish title over property by adverse possession, the claimant must prove

possession of the disputed property for 20 years (735 ILCS 5/13-101 (West 2024)) and that, during the 20-year period, the possession of the disputed property was "(1) continuous, (2) hostile or adverse, (3) actual, (4) open, notorious, and exclusive ***, [and] (5) under claim of title inconsistent with that of the true owner." *Joiner v. Janssen*, 85 Ill. 2d 74, 81 (1981). The claimant must prove that all five elements existed concurrently throughout the 20-year period. *Id.* Also, in addition to those five elements, "the claimant must also prove 'by clear and convincing evidence the exact location of the boundary line to which [the claimant] claim[s].' " *Brandhorst v. Johnson*, 2014 IL App (4th) 130923, ¶ 37 (quoting *Schwartz v. Piper*, 4 Ill. 2d 488, 494 (1954)).

¶ 41 Defendant maintains that, contrary to the circuit court's decision, he carried this exacting burden of proof as to adverse possession by virtue of the split-rail fence. The uncontested testimony was that he had this fence constructed in 1993, and according to defendant, "the testimony shows the fence was still on Plaintiff's property in 2014 when the statute of limitations ran."

¶ 42 Not every reasonable person would necessarily be convinced that the testimony so showed. Our standard of review is deferential. The appellate court has held:

> "In adverse possession cases, [a]ll presumptions are in favor of the title owner, and the party claiming title by adverse possession must prove each element by clear and unequivocal evidence. [Citation.] Because the supreme court has not explained the meaning of 'clear and unequivocal evidence,' courts have applied the clear and convincing burden of proof in adverse possession cases. [Citation.] We will not disturb the trial court's findings unless they were against the manifest weight [of the evidence]. [Citation.] A judgment is against the

manifest weight of the evidence only when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on the evidence." (Internal quotation marks omitted.) *Id.* ¶ 38.

The question for us, then, is not whether we ourselves, if we were the trier of fact, would have found that defendant had proved, by clear and unequivocal evidence, his claim of adverse possession by virtue of the split-rail fence. See *People ex rel. Illinois Historic Preservation Agency v. Zych*, 186 Ill. 2d 267, 278 (1999). Instead, the question for us is this. Was it *within the range of reasonableness* for the circuit court to find that defendant had failed to prove, by clear and unequivocal evidence, his claim of adverse possession by virtue of the split-rail fence? "Where there are different ways to view the evidence, or alternative inferences to be drawn from it, we accept the view of the trier of fact as long as it is reasonable." *Id.*

¶ 43           Although there was undisputed testimony that the split-rail fence had existed for 20 years, it is arguably less than clear that all the split-rail fence, or even some of it, was on plaintiff's property for 20 years. Stewart testified that when he performed the survey in July 2022, he saw no split-rail fence on lot 9. While Williams testified that the new privacy fence was in the same position in which the split-rail fence had been, right up to or adjoining the driveway, Williams was not a surveyor. The circuit court was entitled to believe Stewart over Williams— especially considering that the photographs could be viewed as supporting Stewart's testimony over that of Williams: it does not appear, from the photographs, that the split-rail fence, for most of its length, was directly against the driveway, as the new privacy fence was. See *Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA*, 384 Ill. App. 3d 849, 859 (2008).

¶ 44           Granted, it appears from defendant's exhibit No. 1 that the southernmost post of the western section of the split-rail fence was flush against the driveway. The trouble is, the

record does not appear to reveal when that photograph was taken. It is unclear that the encroaching post had been in that position for 20 years, especially in the light of defendant's admission that the post had drifted over from the shifting of the ground and in the light of Daniel's testimony that the post had not always been in that position but that, instead, defendant had moved it there. It appears from the photographs that the new privacy fence was built directly against the eastern edge of the driveway, whereas most of the split-rail fence (except the post near the sidewalk) had left some space between itself and the driveway.

¶ 45        Thus, the photographs appear to contradict Williams's testimony that the new privacy fence stood *exactly* where the split-rail fence had stood. Because the claim of adverse possession is for inches of land, exactitude matters, and approximation will not suffice. So, we are unconvinced the circuit court made a finding that was against the manifest weight of the evidence when finding that, as to the split-rail fence, defendant had failed to carry his heavy burden of proving adverse possession. See *Brandhorst*, 2014 IL App (4th) 130923, ¶ 38.

¶ 46                              III. CONCLUSION

¶ 47        For the reasons stated, we affirm the circuit court's judgment.

¶ 48        Affirmed.